# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 12, 2002 Session

## HELLEN M. WILSON v. CSX TRANSPORTATION, INC.

**Appeal from the Circuit Court for Hamilton County**
**No. 97CV1509     W. Neil Thomas, III, Judge**

**FILED MARCH 18, 2003**

**No. E2002-00291-COA-R9-CV**

---

This interlocutory appeal raises the question of the admissibility of the testimony of three expert witnesses which the Plaintiff, Hellen M. Wilson, sought to present at trial. The Trial Court excluded the expert testimony of Dr. William J. Nassetta and certified pursuant to T.R.A.P. Rule 9 the following question for this Court: "whether the testimony of the expert witness, William J. Nassetta, M.D., as reflected in [his] attached affidavit,. . .is admissible under the doctrine of the Tennessee Supreme Court decision in *McDaniel v. CSX Transportation, Inc.*" The Trial Court also granted permission to CSX Transportation (CSXT) to appeal its ruling admitting the testimony of two other expert witnesses offered by the Plaintiff. We hold that the testimony of all three expert witnesses is admissible under the principles enunciated in *McDaniel*.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed in Part and Reversed in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Patrick S. O'Brien and Newton G. McCoy, St. Louis, Missouri, and Clarence E. Walker, Chattanooga, for the Appellant, Hellen M. Wilson

Wayne L. Robbins, Jr. and Mary Taylor Gallagher, Nashville, for the Appellee, CSX Transportation, Inc.

## OPINION

Mrs. Wilson brought this action against CSXT under the Federal Employer's Liability Act (FELA), seeking damages for the death of her husband, Ricky J. Wilson, who was employed by CSXT as a carman. Mr. Wilson died on November 12, 1996 as a result of a malignant brain tumor known as a glioblastoma multiforme, and acute myelogenous leukemia. Mr. Wilson was diagnosed with brain cancer at age 40 and died at age 42. Mrs. Wilson alleges several theories of negligence

in connection with his exposure to various chemicals at his workplace, which she asserts caused or contributed to cause his brain cancer and leukemia.

CSXT moved for summary judgment on November 9, 2001, alleging no genuine issue of material fact regarding causation of Mr. Wilson's injuries and death. CSXT presented the testimony of several experts in support of its assertion that there is no proven causal connection between the chemicals to which Mr. Wilson was exposed and his brain cancer and leukemia.

In support of her opposition to summary judgment, Mrs. Wilson presented the testimony of Dr. James E. Girard, a chemist, who opined, *inter alia*, as follows:

> It is my expert opinion, to a reasonable degree of scientific certainty that Mr. Ricky Wilson's sickness and death, were caused by his exposure to chemicals while he was employed as a carman [for] CSX Transportation. He was exposed repeatedly to diesel exhaust. The chemicals which have been described above, namely benzene, toluene, xylene and methylene diisocyanate, toluene diisocyanate, cadmium, and perchloroethylene are all inhalation hazards and can also be absorbed through the skin. According to DuPont Chemical Company, "repeated or prolonged overexposure to solvents may lead to permanent brain and nervous system damage."
>
> Mr. Wilson was exposed to benzene, a known carcinogen. Benzene exposure is recognized as a cause of acute myelogenous leukemia, and has been shown to increase the incidence of neoplasms at multiple sites in chronic inhalation and gavage studies in rodents. He was also exposed to cadmium, a known carcinogen. Cadmium and cadmium compounds are known to be human carcinogens based on sufficient evidence of carcinogenicity from studies in humans including epidemiological and mechanistic information which indicate a causal relationship between exposure to cadmium and cadmium compounds and human cancer. He was also exposed to toluene diisocyanate. Toluene diisocyanate is *reasonably anticipated to be a human carcinogen* based on sufficient evidence of carcinogenicity in experimental animals.

(Emphasis in original). Dr. Vincent F. Garry, a pathologist and toxicologist, testified that in his opinion the group of chemicals to which Mr. Wilson was exposed "was eminently involved in a causal relationship to his cancer."

The Trial Court ruled that the expert testimony of Drs. Girard and Garry was admissible and sufficient to create a genuine issue of fact as to causation. The Court treated CSXT's arguments with regard to the testimony of Plaintiff's expert Dr. William J. Nassetta as a motion in limine to exclude

Dr. Nassetta's testimony. The Court ruled Dr. Nassetta's testimony inadmissible, stating the following in regard to his affidavit:

> I think if you take the medical terminology out of the affidavit, Dr. Nassetta, regardless of what he says in his last paragraph, Dr. Nassetta's affidavit can be boiled down to say, we have a hunch. We don't have any studies or statistical data. We have a hunch and we think at sometime in the future this malady will connected with these compounds.
>
> I don't think that's enough, I really don't, so I'm going to grant the Motion in Limine with respect to Dr. Nassetta.
>
>          *            *            *
>
> [Counsel for Plaintiff]: Dr. Nassetta is not allowed to testify at all?
>
> Court: Right. I just think it's too speculative, Pat. I really do.

The Trial Court granted Mrs. Wilson's motion seeking permission for an interlocutory appeal under Tenn. R. App. P. 9. CSXT filed a similar motion which also was granted, and this Court granted an interlocutory appeal to both parties.

We will first address CSXT's argument made in its brief that "pursuant to Rule 56.03 [of the Tennessee Rules of Civil Procedure], the court should have taken all of the statements set forth in CSXT's Concise Statement of Material Facts and Supplemental Concise Statement of Material Facts as true because the Plaintiff did not, as required by that rule, file any pleading disputing the Concise Statements of Facts filed by CSXT."

Mrs. Wilson's response to CSXT's motion for summary judgment was styled "Plaintiff's additional concise statement of facts and memorandum of law in opposition to Defendant's Motion for Summary Judgment." Although her response does not, in corresponding numbered paragraphs, separately respond to each claimed undisputed fact set forth in the motion for summary judgment, it does set forth at length the facts Mrs. Wilson claims are established by the record, and her assertions as to why they establish a genuine issue of material fact for trial.

This Court was recently presented with an argument very similar to that presented by CSXT in the case of *First Citizens Bank of Cleveland v. Cross*, 55 S.W.3d 564 (Tenn.Ct.App. 2001). The *Cross* Court stated as follows:

> The appellees argue that summary judgment was properly granted to them because, so the argument goes, Cross failed to comply with various provisions of Tenn.R.Civ.P. 56. First, they contend that Cross did not comply with Tenn.R.Civ.P. 56.03, which requires a non-moving party to respond to each fact set forth by the moving party by either (1) agreeing that the fact is undisputed; (2) agreeing

that the fact is undisputed for the purposes of the motion only;  or (3) demonstrating, with specific citations to the record, that the fact is disputed.

*       *       *

We find that Cross' response is substantially in compliance with the requirements of Rule 56.03.  Cross' response adequately sets forth the facts that are undisputed.  Furthermore, it adequately sets forth, with appropriate citations, those facts that she alleges are in dispute.

*Cross*, 55 S.W.3d at 571.  In the case at bar, we have reviewed Mrs. Wilson's response and find it is substantially in compliance with Rule 56.03.

In its appeal, CSXT argues that the Trial Court erred in finding the testimony of Dr. Girard and Dr. Garry admissible and sufficient to establish a genuine issue of material fact regarding causation of Mr. Wilson's death.  In the case of *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn.1997), the Supreme Court addressed in depth the admissibility of expert testimony as contemplated by Rule 702 and 703 of the Tennessee Rules of Evidence.  In *McDaniel*, which was also a FELA case, the Court stated as follows:

After examining the basic legal principles governing the admissibility of scientific evidence and the change in direction by the federal courts, we turn to Tennessee to clarify our standard of admissibility.

In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court.  *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn.1993).  The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused.  *Id.* The specific rules of evidence that govern the issue of admissibility of scientific proof in Tennessee are Tenn. R. Evid. 702 and 703.   The former provides:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

And Tenn. R. Evid. 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those

perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

The plaintiffs contend that the expert testimony in this case is reliable and that it will substantially assist the jury on the issue of causation. The defendant argues that irrespective of *Frye* or *Daubert*, there must be adherence to the strict requirements contained in the language of the rules and also a reasonable standard for proving causation. It contends that the plaintiffs' scientific evidence is unreliable and must be excluded. The defendant argues that an epidemiological study must show a relative risk of greater than 2.0, which several courts have said means that a disease more likely than not was caused by the specific agent or event.[1] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir.1995), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 791 F.Supp. 1042 (D.N.J.1992), *aff'd*, 6 F.3d 778 (3rd Cir.1993). As discussed herein, the factor is certainly relevant but we reject the contention that it should be adopted as matter of law.

Although the advisory comments to Rule 702 indicate that Tennessee has followed the *Frye* test in analyzing the admissibility of scientific evidence, one commentator, recognizing the similarity between Tennessee Rule 702 and Federal Rule Evid. 702, has raised the question of whether the *Frye* test of "general acceptance" should be abolished in Tennessee. N. Cohen, S. Sheppeard, and D. Paine, *Tennessee Law of Evidence*, § 401.20 at 124, n. 233. Indeed, as the trial court in this case noted, there is some evidence of a departure from the strict adherence to the *Frye* test by courts in this State.

In our view, determining the standard for the admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence. For instance, Tenn. R. Evid. 702 requires that the scientific evidence

---

[1] A relative risk of 2.0 means essentially that the group which is studied has a risk which is twice that of the general population of contracting the disease under study.

"*substantially* assist the trier of fact," while its federal counterpart requires only that the evidence "assist the trier of fact." Fed.R.Evid. 702. This distinction indicates that the probative force of the testimony must be stronger before it is admitted in Tennessee. *See, e.g.*, Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 636 (1991).

Similarly, Tenn. R. Evid. 703 states that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." There is no similar restriction in the federal rule. Fed.R.Evid. 703. Thus, as one writer has observed, "the additional language ... [in the Tennessee rule] is obviously designed to encourage trial courts to take a more active role in evaluating the reasonableness of the expert's reliance upon the particular basis for his or her testimony." R. Banks, *Some Comparisons Between the New Tennessee Rules of Evidence and the Federal Rules of Evidence*, *Part II*, 20 Mem.S.U. L.Rev. 499, 559 (1990). In sum, even though the facts and data need not be admissible, they must be reviewed and found to be trustworthy by the trial court.

Based on the foregoing analysis, we conclude that Tennessee's adoption of Rules 702 and 703 in 1991 as part of the Rules of Evidence supersede the general acceptance test of *Frye*. In Tennessee, under the recent rules, a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness. The rules together necessarily require a determination as to the scientific validity or reliability of the evidence. Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy, but there is no requirement in the rule that it be generally accepted.

Although we do not expressly adopt *Daubert*, the non-exclusive list of factors to determine reliability are useful in applying our Rules 702 and 703. A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*, the evidence is generally accepted in the scientific community;

and (5) whether the expert's research in the field has been conducted independent of litigation.

Although the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts, the court need not weigh or choose between two legitimate but conflicting scientific views. The court instead must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation. *See, e.g., Joiner*, 78 F.3d at 530. The trial court should keep in mind that the preliminary question under Tenn. R. Evid. 104 is one of admissibility of the evidence. Once the evidence is admitted, it will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof. After that occurs, a defendant may, of course, challenge the sufficiency of the evidence by moving for a directed verdict at the appropriate times. *See* Tenn. R. Civ. P. 50. Yet it is important to emphasize that the weight to be given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact. *See Joiner*, 78 F.3d at 534-35 (Birch, J., concurring).

We recognize that the burden placed on trial courts to analyze and to screen novel scientific evidence is a significant one. No framework exists that provides for simple and practical application in every case; the complexity and diversity of potential scientific evidence is simply too vast for the application of a single test. *See Developments in the Law--Confronting the New Challenges of Scientific Evidence*, 108 Harv.L.Rev. 1481, 1513-1516 (1995). Nonetheless, the preliminary questions must be addressed by the trial court, *see*, Tenn. R. Evid. 104, and they must be addressed within the framework of rules 702 and 703.

APPLICATION OF STANDARD

The trial court correctly foresaw the trend away from *Frye* and also used the factors set forth in *Daubert* as a framework for analysis. As it observed, the scientific theory that exposure to solvents may cause toxic encephalopathy has been tested frequently over a period of 25 years. Because no precise diagnostic device or biological mechanism can isolate the causal factor, the relevant tests have been epidemiological studies. The experts in this case testified at length about the field of epidemiology and the use of cohort and case-control studies. The experts agreed that epidemiological studies have been

used to test the hypothesis that exposure to solvents causes encephalopathy and that numerous studies support a causal relationship. These studies have been reviewed, reconstructed, published in leading journals in the field, and subjected to peer review. Although the "positive" studies have been criticized for failing to account for confounding factors, the diagnosis is recognized in medical textbooks and journals as well as by several national and world health organizations. We also observe that the research in this area, including that of several of the plaintiffs' experts, was conducted independently of this litigation.

Accordingly, we agree with the trial court's finding that the evidence will substantially assist the jury to understand the evidence and to determine a fact in issue. We also agree with the trial court's conclusion that the methodology and principles underlying the scientific evidence are sufficiently trustworthy and reliable to be presented to the trier of fact. The trial court is not required to determine whether it agrees with the evidence and should not substitute its view for the trier of fact. It should allow the jury to consider legitimate but conflicting views about the scientific proof. Provided the evidence is scientifically valid, criticisms of it and opposing views may be elicited on cross examination and/or established in the defendant's case. That is the essence of the lawsuit.

### CONCLUSION

We have concluded that the scientific evidence proffered by the plaintiffs satisfies the requirements of Tenn. R. Evid. 702 and 703, and that the trial court did not abuse its discretion in admitting it into evidence.

*McDaniel*, 955 S.W.2d 257, 263-66 (Tenn. 1997)(footnotes omitted); *see also Hand v. Norfolk Southern Ry. Co.*, an unreported opinion of this Court filed in Knoxville on June 2, 1998.

Our review of the evidence in light of the foregoing, including the reaffirmation of the discretion accorded trial judges in the admission of expert testimony, persuades us that in this case the Trial Judge was correct in finding that the expert witness testimony of Dr. Garry and Dr. Girard offered on behalf of the Plaintiff met the requirements of Rule 702 and 703 of the Tennessee Rules of Evidence, and that the Trial Court did not abuse its discretion in the admission thereof.

We now turn our attention to the proffered expert testimony of Dr. Nassetta. In its order granting permission to Mrs. Wilson to seek an interlocutory appeal, the Trial Court certified the following question to be answered by this Court:

Whether the testimony of the expert witness, William J. Nassetta, M.D., as reflected in the attached affidavit of Dr. William J. Nassetta is admissible under the doctrine of the Tennessee Supreme Court decision in *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257 (Tenn.1997).

We first address Dr. Nassetta's qualifications as an expert witness. CSXT argues that Dr. Nassetta was not shown to be, in the words of Tenn.R.Evid. 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education." CSXT's attack on Dr. Nassetta is based solely upon its argument that he is unqualified as an expert, as it states in its brief that "the issue before this court, is the qualification of Dr. Nassetta himself, as opposed to the validity of his scientific studies," and "the question does not revolve around the validity of the science but rather around Dr. Nassetta's qualifications to present the opinions."

It is clear to us from both the Court's comments and its wording of the question certified for appeal that its ruling was based on the finding that Dr. Nassetta's affidavit was too speculative and that it did not rely on any studies or statistical data to support his opinions. There is nothing in the record to suggest that the Court found Dr. Nassetta unqualified to give an opinion at all; in fact, the Court ruled that CSXT's "Motion to Strike the affidavit of Dr. Nassetta is not well taken. The court has considered the affidavit of Dr. Nassetta."

Nevertheless, we have reviewed the qualifications of Dr. Nassetta as contained in his curriculum vitae, affidavit and deposition. Dr. Nassetta is a medical doctor licensed to practice medicine in five states who also holds a master's degree in public health. He is board-certified in internal medicine and board-eligible in occupational and environmental medicine. He testified that he is actively involved, on a daily basis, in doing occupational medicine through his work for an occupational toxicology consulting company and an occupational medical staffing and consultation company.

Dr. Nassetta's affidavit further states as follows:

> I have reviewed material safety data sheets, scientific literature, and other toxicological references with regard to the chemicals Mr. Wilson was exposed to during his employment with CSXT, a detailed description of the various employment tasks Mr. Wilson performed while working for CSXT in Birmingham, Alabama, as well as the medical history of Mr. Wilson. I have personally visited the CSXT facility in Birmingham, Alabama where Mr. Wilson worked. I have also reviewed numerous epidemiologic, toxicologic, and other scientific and medical studies involving the various chemicals to which Mr. Wilson was exposed.

Based on our review of the record, we find that Dr. Nassetta meets the requirements of Tenn.R.Evid. 702 and is qualified to render an expert opinion in this case. CSXT's arguments to the contrary, including the fact that Dr. Nassetta has never published a paper about brain cancer, pertain to the weight afforded to his testimony by the trier of fact, and not its admissibility.

According to the Supreme Court's teaching in *McDaniel*, "the trial court must analyze the science and not merely the qualifications, demeanor or conclusions of experts." The *McDaniel* Court stated that the Trial Court "must assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." 955 S.W.2d at 265. Accordingly, we examine Dr. Nassetta's testimony to determine if it is based on valid and relevant science, and not merely a speculative conclusion.

Dr. Nassetta's affidavit states the following in relevant part:

> Ricky Wilson, a black male, was diagnosed with brain cancer at the age of 40. Brain cancer is more common in white males (glioblastoma specifically) and peaks at an older age. Therefore, in the case of Mr. Wilson, it leads one to consider possible occupational, environmental or genetic predispositions as more likely in the causative analysis.
>
> Brain gliomas (these include astrocytomas), in particular appear to be more related to occupational risk factors than other types of brain cancer.
>
> *        *        *
>
> Although the etiology of brain tumors in adults remains largely unknown, a large number of studies have examined the relationship between the environment and occurrence of brain tumors. Despite this, only two unequivocal risk factors have been identified: ionizing radiation and immuno-suppression. Other studies have identified possible environmental risk factors related to brain tumors. These include exposure to such things as: organic solvents, lubricating oils, polyaromatic hydrocarbons, motor exhaust, welding fumes, insecticides, vinyl chloride monomer, formaldehyde, rubber industry, work in electrical occupations, magnetic fields, fungicides and herbicides. Established risk factors for brain cancer, such as genetic predisposition and ionizing radiation can explain only a small proportion of the disease. Conventional lifestyle factors, such as tobacco smoking, alcohol drinking, and dietary intakes, have not been or are only modestly associated with brain cancer risk.
>
> The occupational exposures pursuant to the available historic information were substantial, chronic and without provision for

personal protection, resulting in an optimal environment for the development of tumors, including brain tumors.

It does not appear from the occupational history available that Mr. Wilson was exposed to ionizing radiation or was immuno-suppressed in some way prior to the development of his brain cancer; however, there is ample evidence of his exposure to organic solvents, polyaromatic hydrocarbons, motor exhaust and welding fumes.

Therefore, it is my opinion within a reasonable degree of medical certainty that these factors and Mr. Wilson's occupational exposures caused, or contributed to the cause, of Mr. Wilson's development of brain cancer and leukemia.

Dr. Nassetta admitted in his deposition that he did not have any quantitative information about the amount of exposure or dosage[2] Mr. Wilson had to the various chemicals at issue in this case. He testified as follows regarding his qualitative exposure assessment:

Q: Do you have any information at all about what dosage Mr. Wilson had of any chemicals involved in this lawsuit?

A: No. This is very typical of almost every case in occupational medicine. There is almost never opportunity to have a quantitative dose.

Q: Without knowing dosage can you testify to a reasonable degree of medical or scientific certainty that any of these chemicals caused or contributed to brain cancer?

A: I believe so from a qualitative exposure assessment.

Q: Is that qualitative exposure assessment as a basis for your opinion something that is reasonably accepted in the scientific community?

A: Yes. In fact, if you read most of the epidemiological literature, you'll find that's how most of the studies are done.

*          *          *

---

[2] Dr. Nassetta explained the difference between the concepts of "exposure" and "dose" as follows: "exposure is the potential for coming into contact with a chemical. Dose implies that [the] chemical has actually gone across the interface of the human body."

Q: Do you know of any literature that links any of the chemicals to which Mr. Wilson was exposed to brain cancer?

A: It links them, yes. I think I mentioned those in my opinions.

There are numerous epidemiological studies cited in Dr. Nassetta's opinion, but the one upon which he and Plaintiff primarily rely upon is cited and discussed in a textbook entitled *Occupational Neurology and Clinical Neurotoxicology* (Williams and Wilkins 1994), in a chapter called *Primary Brain Tumors Associated With Chemical Exposure*, which reviews epidemiological studies concerning the association between occupational chemical exposure and brain tumors.

Dr. Nassetta cites and relies upon a study referred to as the *Howe* study, which found as follows:

An examination of cancer mortality between 1965 and 1977 among 44,000 pensioned Canadian railroad workers exposed to PAHs [polycyclic aromatic hydrocarbons] in diesel fumes indicated a significantly elevated brain cancer mortality risk among those who had worked as welders (SMR = 3.18).

The *Howe* study further found an SMR (standardized mortality ratio) of 2.78 for brain cancer among those employees with the job classification "carman." It is not disputed that the SMR, or risk factor relative to the general population, reported in this study (2.78) is statistically significant. Mr. Wilson worked as a carman for CSXT, and his employment involved a large amount of welding. Dr. Nassetta testified in his deposition that "the body of literature considered as a whole conclude[s] that there's a strong association, a strong relative risk, associated with these particular groups of chemicals and the exposures and the outcome that we're looking at in cancer."

While the experts presented by CSXT naturally offer opinions in opposition to that presented by Dr. Nassetta, CSXT does not in its brief challenge or dispute the scientific validity of the *Howe* study or the other literature relied upon by Dr. Nassetta. As the *McDaniel* Court noted, "it is important to emphasize that the weight given to stated scientific theories, and the resolution of legitimate but competing scientific views, are matters appropriately entrusted to the trier of fact." 955 S.W.2d at 265.

We have reviewed the testimony of Dr. Nassetta in light of the factors enunciated in *McDaniel* for determining reliability and admissibility under Tennessee Rules of Evidence 702 and 703, and find it admissible under these authorities.

For the foregoing reasons the judgment of the Trial Court allowing the expert testimony of Drs. Girard and Garry is affirmed, the judgment holding Dr. Nassetta's testimony inadmissible is reversed, and the cause is remanded for trial. Costs of appeal are adjudged against CSX Transportation, Inc.

-12-

_____
HOUSTON M. GODDARD, PRESIDING JUDGE