IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2006 Session

## STATE OF TENNESSEE v. JOSE RODRIGUEZ AND ELADIO CABALLERO SANCHEZ

**Direct Appeal from the Criminal Court for Sumner County**
**No. 215-2004    Jane Wheatcraft, Judge**

---

**No. M2005-00951-CCA-R3-CD - Filed August 7, 2006**

---

The defendants, Jose Rodriguez and Eladio Caballero Sanchez, were convicted of conspiracy to possess marijuana with intent to sell or deliver, a Class A felony. See Tenn. Code Ann. § 39-17-417(j)(13) (2003).  The trial court sentenced each defendant to twenty years in the Department of Correction.  In this appeal, the defendant Rodriguez asserts (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred by admitting evidence of his alleged prior bad acts in violation of Tennessee Rule of Evidence 404(b); (3) that the trial court erred by permitting a state witness to give improper opinion testimony; and (4) that the trial court erred by admitting into evidence a map created by a state witness.  The defendant Sanchez asserts (1) that the evidence is insufficient to support his conviction; (2) that the trial court erred by admitting evidence of his alleged prior bad acts in violation of Rule 404(b); (3) that the trial court erred by admitting into evidence a document that was not provided to the defense prior to trial; (4) that the trial court erred by permitting a state witness to give improper opinion testimony; and (5) that the trial court erred by admitting irrelevant evidence regarding his ownership of property in Mexico.  The judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Geoffrey Coston, Franklin, Tennessee, for the appellant, Jose Rodriguez.

Dale Quillen and Kenneth Quillen, Nashville, Tennessee, for the appellant, Eladio Caballero Sanchez.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; Lawrence Whitley, District Attorney General; and Dee Gay, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 18, 2003, officers of the 18th Judicial District and 20th Judicial District Drug Task Forces participated in a joint investigation based upon a tip from a confidential informant. The informant told officers that a large quantity of marijuana was being transported into the greater Davidson County area via Interstate 65 in a red, full-sized SUV. Officers observed the SUV, initiated a traffic stop, searched the vehicle, and discovered 517 pounds of marijuana. The driver, Robert Rennison, was arrested and, during the ensuing investigation, implicated the defendants in an interstate drug conspiracy.

At trial, Charles Campbell, an officer with the 18th Judicial District Drug Task Force, testified that hours before the seizure of the illegal drugs, he attended a briefing of the 20th Judicial District Drug Task Force wherein it was disclosed that a confidential informant had reported that a large amount of marijuana was being transported into the Nashville area on I-65 in a red, full-sized SUV. He recalled that during the session, there was no mention of either defendant and that Joe Garcia was identified as the primary suspect. After the briefing, the officers broke into teams and began surveillance of different areas along the interstate corridor. Officer Campbell testified that shortly after beginning surveillance, he observed a red SUV on I-65 following a green, two-toned Chevrolet pick-up. He stated that he initiated a stop, approached the driver's side, and, upon smelling marijuana, asked the driver to step to the rear of the vehicle. Officer Campbell testified that when a K-9 officer alerted to the presence of illegal drugs, the vehicle was searched and officers discovered blocks of marijuana taking up the entire passenger compartment. Officer Campbell conceded that the officers did not find any physical evidence connecting either of the defendants to the drugs. The driver, Robert Rennison, was placed under arrest and, because of inclement weather, the vehicle was driven to a local truck stop to be searched. Meanwhile, even though Officer Campbell lost sight of the green truck, other officers followed that vehicle.

Rennison, who was a witness for the state, testified that he had begun transporting marijuana at the urging of a friend some two years before his arrest. He estimated that he had made ten to fifteen deliveries during that time and had earned approximately $15,000 per delivery. He stated that he had met the defendant Sanchez approximately three months prior to his arrest when he made a two hundred pound marijuana delivery to Nashville. It was his recollection that Sanchez and another Mexican man took the vehicle containing the marijuana and "and brought it back . . . empty while [he] waited in the mall." According to Rennison, he met the defendant Rodriguez in Odessa, Texas, when Rodriguez came to take possession of $150,000 from a separate drug transaction. Rennison stated that Rodriguez was responsible for distributing the money to the other participants in the drug conspiracy. Rennison, who had known Joe Garcia since 2001, testified that Garcia's role was to accept delivery of the marijuana from Rennison and then distribute it.

Rennison explained that it was his understanding that the defendant Sanchez, whom he knew as "Primo," was "in charge of the operation . . . in Nashville" and that the defendant Rodriguez "was just an interpreter and he was in on some of the . . . distribution of the funds." As to the December 2003 shipment, Rennison testified that he received a call from "Padro" instructing him to pick up

a load of marijuana in Liberal, Kansas and then transport it to Gallatin, where it would be picked up by Joe Garcia. He recalled that Joe Garcia directed him to drive to the Holiday Inn in Goodlettsville, where Joe Garcia, Judy Garcia, Sanchez, and Rodriguez, were waiting in a green truck. Rennison testified that he pulled alongside the truck and spoke with Joe Garcia, who then spoke to Sanchez in Spanish. Rennison, who did not speak Spanish, stated that neither Sanchez nor Rodriguez spoke English. According to Rennison, Joe Garcia directed him to follow the four of them to the location where the transaction was to occur. He remembered that he followed them onto I-65 and was stopped by police a short time later. Rennison acknowledged that in exchange for his cooperation and his testimony at trial, he had been offered a plea agreement to serve ten years at 30%.

During cross-examination, Rennison conceded that he did not mention either of the defendants in his initial statements to the police. He also admitted that he had conducted all of his business with Joe Garcia and had never spoken with either of the defendants. He acknowledged that his agreement was to pick up the marijuana from Padro and deliver it to Garcia.

Jody Starks, a Drug Task Force officer, testified that a confidential informant had provided information that "several hundred pounds of marijuana had been distributed to the Nashville area" and that "Joe Garcia would be responsible for receiving at least part of that shipment." Officer Starks recalled that the informant had indicated that Garcia would be traveling in a green Chevrolet pick-up truck. The officer testified that he began surveillance of the Garcia vehicle in the parking lot of a McDonald's in Goodlettsville and followed it to a Boot Corral store, where a woman and two men got out of the vehicle, entered the store, and returned to their vehicle a short time later. Officer Starks stated that he followed them to the entrance of a Holiday Inn, where the vehicle pulled alongside a red Suburban. He testified that after a few minutes, the green truck followed the red Suburban onto the interstate and then took the lead. Officer Starks stated that when he alerted other officers stationed along the interstate, they stopped the Suburban for a traffic violation. According to the officer, a K-9 alerted on the Suburban, the vehicle was searched, and officers discovered a large amount of marijuana. Officer Starks stated that because the weather was bad, he drove the Suburban to a nearby truck stop for a more thorough search. During cross-examination, Officer Starks acknowledged that the confidential informant had given no information about either of the defendants.

Judy Garcia, also a state witness, testified that her brother-in-law, Joe Garcia, and his wife, Nancy, asked her to drive them to the Nashville airport, where they picked up the two defendants. Ms. Garcia stated that she then drove to a motel in Rivergate where the defendants stayed overnight. She recalled that she, Joe Garcia, and Nancy Garcia stayed overnight at the residence of Rocky Lind and that on the following day, she drove Joe Garcia to meet the defendants and take them to a Knight's Inn. After they rented a room, she then drove the men to a McDonald's, where she ate at a separate table while the three men talked. Ms. Garcia testified that from there, they went to a "cowboy store" where they "all got out of the vehicle, went in there, . . . looked around . . . [t]hen Joe went outside and [she] ended up going out. And then [Joe] was on the phone, and he . . . asked [her] to go back inside and tell [the defendants] to let's go." She then drove the men to the Holiday Inn, where they met Rennison. According to Ms. Garcia, Joe Garcia asked Rennison "how much" and

Rennison responded that he did not know. She recalled that Joe Garcia then instructed Rennison to follow them as they returned to the interstate. Ms. Garcia stated that Joe Garcia agreed to pay her $1000 to drive him and the two defendants to Cottontown. While on the interstate, she noticed that Rennison, who had been following them, was stopped by police. Ms. Garcia testified that at that point, the defendants started "talking . . . real fast to each other" and appeared "shaken up." She recalled that both Joe Garcia and Rodriguez told her to "just keep going" and "get off at the next exit."

Ms. Garcia testified that she then returned to the defendants' room at the Knight's Inn, where Joe Garcia, after communicating with Rennison by telephone, directed her to drive him back to Rocky Lind's apartment. She recalled that they were stopped by police on the way and arrested. Ms. Garcia, who faced a possible sentence of twenty-five years, also acknowledged that she had entered into a plea agreement with the state. She had pled guilty to the charged offense in exchange for a sentence of eight years as an especially mitigated offender.

During cross-examination, Ms. Garcia conceded that she did not mention either of the defendants in her initial statement to police, instead telling the authorities that she did not know who the "other guys" were or why the were there. She also acknowledged that neither of the defendants spoke to Rennison directly and that neither had offered her any compensation. Ms. Garcia claimed that she did not suspect Joe Garcia of any type of illegal activity until she overheard his conversation with Rennison in the Holiday Inn parking lot.

Joe Garcia testified that on the day before his arrest, the defendant Rodriguez, who was his brother-in-law, telephoned him at his residence in Illinois, inquired whether if he would like to make some money selling marijuana, and asked Garcia to meet him and a friend at the airport in Nashville. According to Garcia, he asked his sister-in-law, Judy Garcia, to drive him and his wife to Nashville to pick up the defendants at the airport and offered her $1000 for her services. He stated that they drove the defendants to a motel in Goodlettsville where he rented them a room. Garcia stated that on the following day, he and Judy Garcia drove the defendants to a Knight's Inn, where he rented a room for each of them with money provided by Sanchez. According to Garcia, the defendants directed him to "[j]ust hang out" until the marijuana arrived.

Garcia testified that his agreement with the defendants required him to "see if he could make some money off of [the marijuana] as soon as possible." He stated that the defendants did not reveal the source of the marijuana but did say that Robert Rennison would be transporting the drugs to Nashville. Garcia confirmed that he intended to sell the marijuana for $600 per pound and that a man named "Donny" had already agreed to purchase five pounds for $3000 which would finance the defendants' return trip. Garcia acknowledged that he planned to take the marijuana to "Donny . . . to get it off the highway" and then divide it into smaller packages.

Garcia testified that he and Judy Garcia picked up the defendants at 2:30 p.m. and that Rodriguez instructed him to telephone Rennison to establish a meeting point. He stated that they then drove to a boot store and, later, to a Holiday Inn, where they met Rennison in the parking lot.

-4-

According to Garcia, Rennison asked for money to rent a room and Sanchez gave him $80. Garcia stated that when he asked Rennison how much marijuana he had, Rennison indicated that he did not know but said, "It's too much in here. I need you to get this stuff out of my truck." Garcia recalled that when the defendants asked about a place to inventory the drugs, he suggested they go to Donny's house. He recalled that Rennison followed them from the Holiday Inn onto the interstate, where Rennison was stopped by police. According to Garcia, at that point the defendant Sanchez remarked that he wanted to get out of the area as soon as possible. He described Rodriguez as "scared." Garcia stated that he directed Judy Garcia to the Knight's Inn, where Sanchez asked him to telephone Rennison. According to Garcia, Rennison claimed that he had only been issued a traffic citation and then released. Garcia testified that he and Judy Garcia then left the two defendants at the motel before being stopped by the police. Garcia acknowledged that he had entered into a plea agreement with the state whereby he had received a twelve-year sentence in exchange for his plea to the charged offense.

During cross-examination, Garcia admitted that in their first telephone conversation, Rodriguez stated that he needed help looking for work. Garcia also admitted that he had previously committed perjury during a jury-out hearing, explaining that he was nervous. When confronted with his initial statement to police, which contained a number of statements inconsistent with his testimony at trial, Garcia stated that he "just [did]n't know how to write and read that good." He claimed that he had simply told the officer "what he wanted to hear." Garcia conceded that he had lied about the number of times he had met Rennison and admitted having received four marijuana shipments from Rennison in the past. He acknowledged that he had been selling marijuana for "a few years" and explained that his usual practice was to buy several hundred pounds and then sell it in one ounce packages. He testified that he had never purchased five hundred pounds before and that he felt that that amount was "too much."

James McWright, Director of the 20th Judicial District Drug Task Force, corroborated the testimony of the other officers regarding the surveillance of the two vehicles prior to the stop of Rennison's vehicle. He testified that he continued surveillance of Garcia's vehicle after Rennison's vehicle was stopped and followed it to the Knight's Inn. He stated that all four occupants of the vehicle entered a room at the Knight's Inn and that shortly thereafter, Joe and Judy Garcia returned to the vehicle and left. Officer McWright testified that he stayed at the Knight's Inn and watched the defendant's room, awaited the arrival of a Spanish speaking officer, and then placed the defendants under arrest. He described the two defendants, each of whom consented to a search of their room, as cooperative. He confirmed that no drugs, money, or guns were found in their possession.

Michael McLerran of the 18th Judicial District Drug Task Force, who processed the defendants and their personal property, testified that Rodriguez indicated that he was from Midland, Texas, and was unemployed at the time of his arrest. Officer McLerran stated that Sanchez also indicated a Midland address and claimed that he was employed as a bartender.

Greg Bunch, Assistant Director of the 18th Judicial District Drug Task Force, testified that as a result of information obtained from the confidential informant, he assembled a joint

investigation of fifteen officers from the 18th and 20th Districts. According to Officer Bunch, he arrested Rennison and then asked him to place several telephone calls to Joe Garcia. The officer testified that based on the content of those conversations, a decision was made to place the defendants and the Garcias under arrest. Officer Bunch stated that he interviewed each of the suspects and inventoried the contents of the defendants' wallets and luggage, discovering baggage tags indicating flights originating in Houston and ending in Nashville. He stated that each of the defendants had two return plane tickets with different addresses and phone numbers. Officer Bunch also found a card with Rennison's cellular telephone number in Sanchez's wallet and discovered a card with three telephone numbers for Joe Garcia in Rodriguez's wallet.

Officer Bunch, who testified that he had participated in approximately 1500 controlled drug buys, explained that the going rate for marijuana was dependant upon the type of marijuana. He described the marijuana recovered in this case as "Mexican pot," which typically sold for $100 an ounce. He stated that "Mexican marijuana" was "highly compressed" so as to be shipped across the border. Officer Bunch testified that he had never been involved in a drug transaction involving more than five hundred pounds of marijuana where two individuals who were "not associated with the deal" were present. He explained that it was "unheard of" because the activity is "totally illegal." Officer Bunch learned during a bond hearing that Sanchez had admitted ownership of a 1000-hectare (2400 acre) ranch in Coyame, Mexico. The officer prepared and presented into evidence a map showing the relative location of Coyame, Mexico; Liberal, Kansas; and Goodlettsville.

During cross-examination, Officer Bunch conceded that other business cards unrelated to this case were also discovered in each of the defendants' wallets. He also admitted that cell phone records established that Rennison had not called Sanchez at any time and had not communicated with anyone other than Joe Garcia during the offense. He conceded that Rodriguez had never been arrested for a drug crime. He acknowledged that "Mexican pot" could be grown anywhere and admitted that he had no idea of the origin of the drugs seized from Rennison. The officer also acknowledged that all but one of the bags in which the marijuana was packed had English writing on the front. He conceded that while it was his suspicion that the marijuana had come from Sanchez's ranch, he had no proof to support that view. Officer Bunch admitted that the Drug Task Force did not have any prior intelligence concerning either of the defendants and expressed full awareness that the target of the investigation was Joe Garcia.

Yvonne Rodriguez, the wife of the defendant Rodriguez, testified as a defense witness. She stated that she had been married to Rodriguez for twenty-two years and had managed the family finances during that entire time. Ms. Rodriguez asserted that her husband had only a fifth-grade education and did not "know how to even fill out a check." She testified that her husband was a U.S. citizen, spoke very little English, had some income from a retirement plan at a previous job, and worked doing "a little bit of everything," including construction, mining, and truck driving. According to Ms. Rodriguez, it had become more difficult for him to find work in the months prior to his arrest and the family was experiencing financial trouble. She testified that he worked occasionally laying carpet and installing cabinets but had to be home by 2:00 p.m. to pick up their grandchildren from school. She stated that it would have been impossible for her husband to have

traveled out of the state in the two years prior to his arrest because of the family's financial difficulties and because he had to take care of their grandchildren when they were not in school. According to Ms. Rodriguez, her husband had asked her brother, Joe Garcia, to help him get a job working construction in the Nashville area. She stated that they chose a time near Christmas for Rodriguez to look for a job because "anytime around Christmastime, you have a lot of Spanish people that go back into Mexico, and there's a lot of vacancies."

During cross-examination, Ms. Rodriguez admitted that Sanchez was a friend to her husband but claimed that she did not otherwise know anything about him. She could not explain why Sanchez was traveling with her husband to Nashville and acknowledged that the two had never been on a trip together prior to their arrest. Ms. Rodriguez testified that "Primo," translated literally as "cousin," was "a common name that everybody in the Spanish National uses to anybody as friends."

The defendant Rodriguez testified on his own behalf that he had five years of education in Mexico and was able to speak only "simple" English. He stated that during the 1990s he worked at Arco Chemical Plant in Houston until the plant was shut down and then worked at a "rock plant" in Terlingua "for quite a while" until "things slowed down." He recalled that he then went to work driving a dump truck for a friend and later, when he was unable to find work using the truck, he worked in carpentry and carpet installation. He stated that he had also worked driving heavy machinery for road crews. Rodriguez, who denied having sold drugs on any occasion, claimed that he came to Nashville only because his wife's family was there and "it seemed like a good thing to do because I didn't have any money. [Garcia] told me he was going to help me out to get a job." Rodriguez claimed that Sanchez came with him to look for a job as well and that he and Sanchez switched hotels only because the Knight's Inn was cheaper than the Comfort Inn. Rodriguez contended that when Rennison was stopped by police he "didn't know what was going on and . . . [he] got mad" and asked Garcia to take him back to the motel. He insisted that he never realized that Garcia was involved in a drug transaction. Rodriguez confirmed that he had "a clean record" and had never been arrested for a drug crime.

During cross-examination, Rodriguez claimed that he was unaware that Garcia lived in Illinois and asserted that he believed Garcia lived in Nashville. He contended that Garcia paid for his plane ticket to Nashville and stated that Sanchez had paid for his own ticket. Rodriguez claimed that he did not know Rennison and had never called his cellular telephone. Rodriguez confirmed that Garcia stopped and spoke to "a gentleman" in a red Suburban but insisted that he did not know who the man was.

Sanchez did not testify.

I.

Each of the defendants asserts that the evidence was insufficient to support the convictions. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the

reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Where the evidence is entirely circumstantial, the jury must find that the proof is not only consistent with the guilt of the accused but inconsistent with his innocence. There must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypothesis except that of guilt. Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). The trial court has the duty to charge the jury on the weight and significance of circumstantial evidence when it is the only basis upon which the state's case rests. Bishop v. State, 287 S.W.2d 49, 52 (Tenn. 1956). Like all other fact questions, the determination of whether all reasonable theories or hypotheses are excluded by the evidence is a jury question. State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987); see Marable, 313 S.W.2d at 451, 457 (Tenn. 1958).

The jury is governed by four rules when testing the value of circumstantial evidence: (1) The evidence should be acted upon with caution; (2) all of the essential facts must be consistent with the hypothesis of guilt; (3) the facts must exclude every other reasonable theory except that of guilt; and (4) the facts must establish such a certainty of guilt as to convince beyond a reasonable doubt that the defendant is the perpetrator of the crime. Marable, 313 S.W.2d at 456.

The defendants specifically contend that the evidence was insufficient to support their convictions because it was based upon the uncorroborated testimony of accomplices. It is well settled that a defendant cannot be convicted upon the uncorroborated testimony of accomplices. Sherrill v. State, 321 S.W.2d 811, 814-15 (Tenn. 1959); Prince v. State, 529 S.W.2d 729, 732 (Tenn. Crim. App. 1975). "An accomplice is defined to be a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." Clapp v. State, 30 S.W. 214, 216 (Tenn. 1894); see also Letner v. State, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974). A common test is whether the alleged accomplice could have been indicted for the offense. State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). The rule is that "there should be some fact testified to entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but that the defendant is implicated in it." State v. Fowler, 373 S.W.2d 460, 463 (Tenn. 1963) (citing Clapp, 30 S.W. at 216; Sherrill, 321 S.W.2d at 814-15; Garton v. State, 332 S.W.2d 169, 173 (1960)). This requirement is met if the corroborative evidence fairly and legitimately tends to connect the accused with the commission of the crime charged. Marshall v. State, 497 S.W.2d 761, 765-66 (Tenn. Crim. App. 1973). Only slight circumstances are required to furnish the necessary corroboration. Garton, 332 S.W.2d at 175. Accomplices, however, cannot corroborate one another. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995).

The defendants were convicted of conspiracy to possess with intent to sell or deliver more than three hundred pounds of marijuana. Tennessee Code Annotated section 39-12-103 provides, in pertinent part, as follows

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a) (2003). "It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to manufacture, deliver or sell such controlled substance." Tenn. Code Ann. § 39-17-417(a) (2003).

The state concedes that in this case, Rennison, Joe Garcia, and Judy Garcia were all accomplices but it argues that their testimony was sufficiently corroborated by other proof at trial. The record, of course, establishes that each of the accomplices testified that both defendants were involved in the conspiracy to transport and sell the marijuana. The officers confirmed the defendants' presence in the Garcia vehicle during the rendevous with Rennison in the parking lot of the Holiday Inn. In addition, plane tickets found in the defendants' possession established that they had indeed flown into Nashville on the day prior to their arrest. Further, each defendant possessed two separate return tickets bearing different home addresses. Surveillance of the defendants also confirmed that they were staying at the Knight's Inn. Rennison's testimony about the prior drug transactions involving each of the defendants provided proof of their intent in this instance. In addition, while the defendants claimed that they did not know Rennison, Sanchez had a card with his cellular telephone number written on it. Rodriguez had possession of three of Garcia's phone numbers. Under these circumstances, it is our view that the testimony of the accomplices was sufficient to support the defendants' convictions.

## II.

Each of the defendants asserts that the trial court erred by permitting Rennison to testify about their prior bad acts in violation of Tennessee Rule of Evidence 404(b). Sanchez complains that Rennison should not have been allowed to testify that he had delivered two hundred pounds of marijuana to him in Nashville several months prior to the charged offense. Rodriguez contends that Rennison should not have been permitted to testify that he had personally delivered $150,000 to him in Odessa, Texas, as proceeds from a drug transaction. The state submits that the evidence was admissible to establish the defendants' intent to participate in the conspiracy and to rebut their claim that they were "merely present" during the transaction.

Tennessee Rule of Evidence 404(b) provides as follows:

Character evidence not admissible to prove conduct; exceptions; other crimes. -- (a) Character Evidence Generally. -- Evidence of a person's character or a trait of

character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:

. . . .

(b) Other Crimes, Wrongs, or Acts. -- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard

v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Cohen, supra § 4.04[8] (4th ed. 2000). Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). "The danger is that even if relevant to a contested material issue, the 'other crimes' evidence may be actually more in the nature of prohibited 'propensity evidence.'" State v. David Kyle Gilley, No. M2003-00499-CCA-R9-CD, slip op. at 15 (Tenn. Crim. App., at Nashville, Feb. 26, 2004).

In this case, each defendant objected to Rennison's testimony both prior to and during the trial. The trial court, which conducted a hearing outside the presence of the jury as required by the rule, concluded that the testimony was admissible:

> The Court is going to allow Mr. Rennison to testify. I don't think that this is coming in for the purpose of proving character. We've had an out of jury hearing. I think that a material issue does exist other than conduct conforming with the character trait, and that is the issue of the intent. And I think that the testimony of this defendant clearly speaks to the issue of intent; that it is clear and convincing; and that its probative value outweighs that of . . . unfair prejudice. So the Court is going to permit it.

Because the trial court complied with the requirements of Rule 404(b), the question is whether there was an abuse of discretion. See DuBose, 953 S.W.2d at 652.

Here, the defendants claimed that they had no prior knowledge of the deal between Joe Garcia and Rennison, that they were unaware that Rennison possessed drugs, and that they were "merely present" in Garcia's vehicle during the time frame alleged in the indictment. As indicated, the trial court ruled that Rennison's testimony was admissible to establish the defendants' intent. One leading treatise on the subject provides as follows:

> Intent is ordinarily inferred from evidence of the defendant's overall plan to commit such crimes or from proof of defendant's motive. A related inference is the inference that a person intended a certain result if he or she had previously acted in the same way and achieved the same result. This inference is stronger if the previous acts and results closely resemble those alleged in the instant case.

Cohen, supra, § 4.04[10] (4th ed. 2000) (footnotes omitted). This court has previously held that proof that the defendant was involved in selling drugs on a prior occasion was admissible to establish his intent to engage in the sale of drugs during the charged offense. See State v. Samuel L. Giddens, No. M2002-00163-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 4, 2003); State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD (Tenn. Crim. App., at Nashville, Jan. 22, 2003); see also State v. Little, 854 S.W.2d 643, 649 (Tenn. Crim. App. 1992) (evidence of prior drug transactions was admissible to show intent and to rebut defendant's contention that he was "a victim

of circumstance"); State v. Bernard Jerome Jones, No. M2000-00018-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 20, 2000); State v. Johnny Wayne Tillery, No. 01C01-9506-CC-00182 (Tenn. Crim. App., at Nashville, Mar. 30, 1998). Rennison testified that approximately three months prior to the offense at issue, he had delivered two hundred pounds of marijuana to Sanchez and another Mexican in Nashville. He also testified that he met Rodriguez in Odessa, Texas when Rodriguez arrived to accept $150,000 from a prior drug transaction. In our view, this testimony was relevant to establish the defendants' intent to participate in the conspiracy and to rebut the assertion that they were merely present. Further, the probative value of this testimony was so great as to outweigh the danger of unfair prejudice.

Moreover, while each of the defendants contends that the evidence of the prior bad acts was not "clear and convincing" because it was based on the testimony of an accomplice, neither has cited any authority for this proposition. It is well established that an accused may not be convicted solely upon the uncorroborated testimony of an accomplice. See, e.g., State v. Caldwell, 977 S.W.2d 110, 114 (Tenn. Crim. App. 1997). The burden of proof required for conviction, however, is greater than the "clear and convincing evidence" standard required by Rule 404(b). The clear and convincing evidence standard is met when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). As indicated, the trial judge, who saw the witnesses and heard the testimony firsthand, concluded that the evidence was clear and convincing. Other than Rennison's status as an accomplice, the defendants have provided no reason to question this conclusion. This court has found no authority suggesting that corroborating testimony is necessary in this context. Under these circumstances, it is our view that the trial court did not err by permitting Rennison's testimony regarding the prior acts.

III.

Next, each of the defendants asserts that the trial court erred by permitting Officer Greg Bunch to provide expert opinion testimony that the marijuana seized was "Mexican" marijuana and that individuals who were not involved in the conspiracy would not be present during a drug transaction involving such a large amount of drugs. With regard to Officer Bunch's testimony that the marijuana was "Mexican," the state submits that the defendants waived appellate review of this issue by failing to lodge a contemporaneous objection. The state also asserts that neither statement qualified as opinion evidence.

As the state correctly points out, the defense did not immediately object to the testimony at issue. The record establishes, however, that the defense questioned the admissibility of the testimony shortly after it was offered when the defense requested a jury-out hearing in relation to the officer's opinion regarding the "mere presence" of observers at a transaction involving such a large amount of drugs. Curative instructions were at least possible at that point. The record also establishes that each of the defendants raised the issue in his motion for a new trial. Under these circumstances, it is our view that waiver does not apply. Moreover, whether properly assigned or not, this court may, under proper circumstances consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused [must not have waived] the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

Id. at 641-42 (footnotes omitted). Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Rule 701 of the Tennessee Rules of Evidence, which governs opinion testimony by lay witnesses, provides in pertinent part as follows:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) rationally based on the perception of the witness and
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). As our supreme court has observed, the Advisory Commission described the intent of the rule as follows:

> The rule rather specifically circumscribes the area where a lay witness can testify to opinions as opposed to facts. The Commission believed that the instances would be rare where a witness could not convey thoughts to the jury by enumerating facts, leaving it to the jurors to draw inferences. In situations where a witness "cannot readily and with equal accuracy and adequacy" testify without an opinion, the witness may state opinions requiring no expertise. Consequently, a lay witness may testify that a person was "drunk" or that a car was travelling "fast."

State v. Sparks, 891 S.W.2d 607, 614 (Tenn. 1995) (citing Tenn. R. Evid. 701, Advisory Comm'n Comment). Tennessee Rule of Evidence 702, relating to expert opinions, provides as follows:

-13-

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702. This court has concluded that "lay opinion testimony under Rule 701 is limited to those observations of a lay witness that are not based on scientific, technical or other specialized knowledge which would qualify the witness as an expert under Rule 702." State v. Timothy Murrell, No. W2001-02279-CCA-R3-CD, slip op. at 8(Tenn. Crim. App., at Jackson, July 2, 2003) (citing United States v. Conn, 297 F.3d 548, 553 (7th Cir. 2002)).

Here, Officer Bunch described the marijuana seized from Rennison as "Mexican" because of its appearance, explaining that locally grown marijuana, referred to as "BC bud" was "very spongy" while marijuana grown in Mexico and transported across the border was "highly compressed." Officer Bunch's conclusion qualifies as an expert opinion because it is based upon the "specialized knowledge" that he obtained as a drug enforcement officer. See Tenn. R. Evid. 702; Murrell, slip op. at 8. In consequence, the testimony must comply with the requirements of Rule 702 in order to be admissible. Generally, the admission of expert testimony is largely entrusted to the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). On appeal, "the abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000) (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)); see also State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997).

Officer Bunch testified that he had participated in over one thousand controlled drug purchases during his tenure as a law enforcement officer. He stated that in gathering information from each of those transactions regarding the origins of the marijuana, he had learned that locally grown marijuana and that grown outside this country, particularly in Mexico, possess different physical attributes. He offered a detailed explanation to the jury as to the differences. While conceding that he was not a horticulturist, Officer Bunch testified that the marijuana seized from Rennison was consistent in appearance to marijuana he had seized in previous transactions which was of known Mexican origin.

While a close issue, it is our view that Officer Bunch's opinion that the marijuana was "Mexican" did not substantially assist the trier of fact. The real issue was whether the defendants were participants in the conspiracy to distribute the five hundred pounds of marijuana possessed by Rennison regardless of its place of origin. Officer Bunch conceded that "Mexican" was the term used to refer to marijuana that was compressed and did not necessarily indicate its place of origin. He acknowledged that "Mexican" marijuana could be grown anywhere, conceding that his use of the term was generic.

-14-

That Officer Bunch was unable to state with certainty that the marijuana originated in Mexico lessened the probative value of his opinion that the marijuana was "Mexican." While each of the defendants was of Mexican ancestry, the only proof at trial was that both lived in Texas at the time of the offense. As to the defendant Rodriguez, the proof at trial established that he had not lived in Mexico since he was a child. Further, while there was proof that Sanchez owned a ranch in Mexico, there was no evidence that he had ever lived on the ranch. In addition, there was no proof that either of the defendants had any family ties in Mexico at the time of the offense. Because each of the defendants was of Mexican ancestry, there was potential for prejudice by the use of the term "Mexican marijuana." See Tenn. R. Evid. 403. In any event, Officer Bunch's acknowledgment that the term "Mexican marijuana" did not indicate that the contraband originated in Mexico mitigated the potential for prejudice.

In our assessment, the physical appearance of the marijuana may have been helpful to the jury in determining that the marijuana was portable, consistent with the state's theory of the conspiracy. The use of the term "Mexican," rather than "compressed" or some equally neutral term, in light of he fact that the defendants, while United States residents, were of Mexican ancestry was perhaps more prejudicial than probative. It is our also view, however, that the error qualifies as harmless, having had no effect on the verdict. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a) As indicated, Officer Bunch acknowledged that he could not state with certainty that the marijuana was grown in Mexico and knew of no connection between the marijuana and the Sanchez ranch. Further, that the error was harmless, in context, suggests that consideration of the issue is "not necessary to do substantial justice" and, therefore, not plainly erroneous. Adkisson, 899 S.W.2d at 642.

Rodriguez also complains that the trial court erred by permitting Officer Bunch to give expert testimony that he had never known of a transaction involving such a large amount of drugs where observers were "merely present" and not participants in the illegal activities. He contends that the testimony did not meet the requirements of admission under State v. Smith, 42 S.W.3d 101, 113 (Tenn. Crim. App. 2000), and McDaniel v. CSX Transportation Inc., 955 S.W.2d 257, 264 (1997). The state submits that the officer's testimony was not opinion evidence but was rather a statement of a fact.

At trial, the prosecutor asked Officer Bunch whether he had "ever seen a situation where conspirators bring along anyone that's not involved in the conspiracy." Defense counsel objected, arguing that the question demanded "opinion that would require the witness to be qualified as an expert." The prosecutor responded that he believed Bunch was qualified as an expert and the trial court overruled the objection, observing, "He's had a long career in working with narcotics." The prosecutor asked the question again and Officer Bunch responded, "No, I've never heard of one. I've never seen one. It's unheard of. I mean, just, if you think about the process of what you're doing, it's totally illegal, and for someone to bring two individuals who are not associated with the deal, absolutely not."

-15-

Rodriguez contends that this testimony was not admissible because "the underlying facts or data upon which" it was based were not trustworthy. See Smith, 42 S.W.3d at 113. Tennessee Rule of Evidence 703 focuses on the reliability of expert opinion testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

In McDaniel, our supreme court concluded that to determine "the standard of admissibility of scientific evidence requires an analysis of the unique language found in Rules 702 and 703 of the Tennessee Rules of Evidence." 955 S.W.2d at 264. Our high court observed that Rule 702 requires that the evidence "substantially assist the trier of fact," while the federal rule requires only that the evidence "assist the trier of fact." Id. The court concluded that the probative force of expert testimony must be stronger under the state standard than under the federal rules. Id. Rule 703 provides that trial courts "'shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate a lack of trustworthiness.'" Id. (quoting Tenn. R. Evid. 703). Even if expert testimony tends to provide substantial assistance to the jury, the testimony is admissible only if it is based upon reliable facts or data. Shuck, 953 S.W.2d at 668.

In this case, Officer Bunch's testimony was based upon his observations as a law enforcement officer and upon the statements made by individuals he had arrested during drug transactions. He admitted that individuals involved in illegal drug transactions often lie to the police and noted that, "a lie is really as good as the truth . . . as far as [he was] concerned." While acknowledging that some of those he had arrested at drug transactions in the past had claimed that they were merely present, he explained that he simply did not believe them. He conceded, therefore, that he had "no way of knowing" the truthfulness of the statements upon which he had based his opinion.

Under these circumstances, it is our view that the state failed to establish that the facts upon which Officer Bunch's testimony was based were reliable. In consequence, the trial court erred by permitting Officer Bunch to testify as an expert that people who are not a part of the transaction are not "merely present" in cases involving such a large quantity of drugs. It is also our view, however, that this error also qualifies as harmless, see Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a), when considered in the context of the proof at trial. Rennison, Joe Garcia, and Judy Garcia each testified that the defendants were participants in the conspiracy. There was circumstantial evidence to corroborate their testimony. The speculation by the officer was not, in our view, helpful to the state.

IV.

Each of the defendants next contends that the trial court erred by permitting Officer Bunch to testify that Sanchez owned a large ranch in Mexico and by admitting into evidence a map depicting the location of the ranch, Odessa, Texas, Liberal, Kansas, and Goodlettsville. They assert that neither the testimony nor the map was relevant. The state submits that the fact that Sanchez owned a large ranch was relevant as it tended to impeach Rodriguez's testimony that Sanchez was in financial trouble and had come to Tennessee to look for work. The state also asserts that Sanchez's ownership of the ranch was relevant because Officer Bunch had testified that the marijuana seized from Rennison was "Mexican" marijuana and had been compressed for shipment across the border. The state contends that the map was relevant for the same reasons.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. At the discretion of the trial court, however, relevant evidence may be excluded if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403. This court will not reverse the trial court absent an abuse of discretion. See State v. Stout, 46 S.W.3d 689, 700 (Tenn. 2001).

Here, Officer Bunch testified that Sanchez had indicated during a pretrial hearing that he owned a 1000-hectare ranch near Coyame, Mexico. Officer Bunch explained that 1000 hectares is more than 2400 acres. The officer stated that he had not seen the ranch but conceded that the general terrain was rough and desert-like and that he had not seen any farms or crops in the surrounding area. The state then introduced a map that Officer Bunch had prepared which depicted the location of the ranch and other cities. The defendants objected to the testimony regarding the ranch and the map, claiming that there had been no proof that the marijuana had been grown on the ranch. The state acknowledged that it had no proof as to the origin of the marijuana but argued that it was permitted to imply that the marijuana could have come from the Sanchez ranch. The trial court admitted the testimony, concluding that "since Mr. Sanchez apparently has testified at a prior hearing that he owns property there, I think that it is proper." The court also observed that the testimony and the map were admissible as part of the state's theory of the case despite the fact that there had been no testimony or other proof linking the ranch to the marijuana. Finally, the trial court ruled that the prejudicial effect of the evidence was not substantially greater than its probative value.

In our view, the fact that Sanchez owned a ranch in Mexico and the map depicting the location of the ranch was not particularly probative, neither qualifies as irrelevant. The testimony regarding Sanchez's ownership of such a large piece of property would have been admissible to rebut Rodriguez's testimony that Sanchez was experiencing financial difficulties. The map simply served

as a demonstrative aid of the state's theory of the case. Under these circumstances, it is our view that the trial court did not err by permitting the testimony regarding the ranch or by admitting the map into evidence.

V.

Sanchez asserts that the trial court erred by admitting into evidence a business card that had Rennison's telephone number that was found in his wallet but was not disclosed prior to trial. The state submits that there was no error because the defendant failed to establish bad faith and because the trial court provided the defendant time to review the evidence.

Tennessee Rule of Criminal Procedure 16 provides, in pertinent part, as follows:

> Documents and Tangible Objects. Upon request of the defendant, the [s]tate shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the [s]tate, and which are material to the preparation of the defendant's defense or are intended for use by the [s]tate as evidence in chief at the trial, or were obtained from or belong to the defendant.

Tenn. R. Crim. P. 16(a)(1)(C). The rule also provides for a continuing duty to disclose such evidence:

> If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, the party shall promptly notify the other party or the other party's attorney or the court of the existence of the additional evidence or material.

Tenn. R. Crim. P. 16(c). Here, the state concedes that it failed to disclose the card as required by the rule.

When a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2). Whether a defendant has been prejudiced by the state's failure to disclose information is a significant factor in determining an appropriate remedy. State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The relevant inquiry is what prejudice has resulted from the discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, had on the issue of a defendant's guilt. State v. Ronald Mitchell, No. 02C01-9702-CC-00070, slip op. at 7 (Tenn. Crim. App. at Jackson, Sept. 15, 1997) (citing State v. Cottrell, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992)); State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981)). "This court will not presume prejudice from a mere allegation." State v. Quincy L. Henderson, No. 02C01-9706-CR-00227, slip op. at 10 (Tenn. Crim. App., at Jackson, May 12, 1998). Exclusion of

evidence is a "drastic remedy and should not be implemented unless there is no other reasonable alternative." Smith, 926 S.W.2d at 270.

The business card recovered from Sanchez's wallet had Rennison's cellular telephone number written on it. The defendant objected because the state had failed to disclose the card prior to trial. As a remedy, the trial court elected to give the defense "time to review that material," concluding that the state had not deliberately withheld the evidence in the discovery process.

In our view, the trial court did not err by admitting the card into evidence. While the state conceded that it had not provided the evidence prior to trial, it attributed the error to neglect. There was no proof that the evidence was purposely withheld from the defense. The trial court indicated that it would give the defense ample time to review the evidence. That was an appropriate remedy. See Tenn. R. Crim. P. 16(d)(2). Sanchez is not entitled to relief on this issue.

Accordingly, the judgments of the trial court are affirmed.

 

_____
GARY R. WADE, PRESIDING JUDGE