IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 3, 2017

## MARY WAGONER-ANGELIN v. RANDALL JON ANGELIN

**Appeal from the Circuit Court for Hamilton County**
**No. 12-D-1291     L. Marie Williams, Judge**

_____

### No. E2016-01850-COA-R3-CV

_____

This appeal concerns post-divorce matters pertaining to a marital dissolution agreement ("the MDA") and a parenting plan. Mary Wagoner-Angelin ("Mother") filed a petition seeking modification of the parenting plan against ex-husband Randall Jon Angelin ("Father") in the Circuit Court for Hamilton County ("the Trial Court"). Father filed an answer and counterclaim challenging the alimony provision in the MDA. Mother later amended her petition to include allegations of civil contempt for Husband's alleged failures to abide by the MDA and parenting plan. After a trial, the Trial Court, *inter alia*, found Father in contempt. Father appeals to this Court. We affirm the Trial Court in its determination that Father is bound by the provisions of the MDA. We affirm the Trial Court in its finding an upward deviation for the parties' daughter Rachel's private school tuition. Regarding the other issues, we remand with instructions. The judgment of the Trial Court therefore is affirmed, in part, vacated, in part, and remanded for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in part, and Vacated, in part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

William H. Horton, Chattanooga, Tennessee, for the appellant, Randall Jon Angelin.

Jennifer H. Lawrence and David H. Lawrence, Chattanooga, Tennessee, for the appellee, Mary Wagoner-Angelin.

# OPINION

## Background

Mother and Father were married in April 1997. Two children were born of the marriage: Barbara, born in December 1997, and Rachel, born in July 2000. Barbara reached majority age by the time of trial in this matter. Mother and Father divorced in October 2012. The divorce decree incorporated the MDA and a permanent parenting plan. The following provisions of the MDA are in dispute on appeal:

> 2.1. **Alimony**. Husband shall pay to Wife the sum of One Thousand Five Hundred Dollars ($1,500.00) per month beginning the first day of the month following the entry of the Final Decree of Divorce in this matter, as non-modifiable alimony for a period of ten (10) years. Such alimony payments, and any adjusted alimony payments as herein provided, shall be taxable to the Wife and deductible to the Husband for Federal and state income tax purposes. All unpaid alimony payments for the period stated in and pursuant to this paragraph shall terminate upon Wife's death but not upon Husband's death or the remarriage of Wife. In the event of Husband's death prior to the expiration of the nine-year period of alimony, Wife will be treated as a secured creditor for any claim for the remaining alimony due for the nine-year period of alimony, which remaining alimony shall be paid by Husband's estate over any remaining alimony term as herein provided. Husband and Husband's estate shall not be required to pledge any assets or take any action to make Wife a secured creditor.

> \*\*\*

> Husband and Wife own real estate located at . . . , Ooltewah, Tennessee 37363 ("*the Marital Residence*" herein). The parties agree that the Marital Residence shall be the separate property of the Wife with all right, title and interest in that real property being divested out of the Husband and vested solely in the Wife. Wife agrees to pay to Husband the sum of Thirteen Thousand Five Hundred Dollars ($13,500.00) for his one-half (1/2) of the equity in the Marital Residence. The Husband shall execute any and all documents, including but not limited to a Quit Claim Deed, to his interest in said real property. The Wife shall be responsible for all liabilities on the real property located at that address and will indemnify and hold the Husband harmless thereon.

Wife shall make every effort to refinance the Marital Residence within three (3) to five (5) years of the entry of the Final Decree of Divorce in this matter.

Husband shall be responsible for resolving the flooding issues of the Marital Residence and will ensure that a termite inspection and treatment for termites in the Marital Residence is completed within six (6) months of the filing of the Final Decree of Divorce in this matter.

Husband shall also be responsible for the repair and stain of the deck and porch at the Marital Residence as well as the repair and stain of their children's wooden jungle gym within one (1) year of the entry of the Final Decree of Divorce in this matter.

Under the terms of the parenting plan, Mother was designated primary residential parent of the two children. Father was ordered to pay $1,000 per month in child support, including an upward deviation to account for a portion of the children's private school tuition. Educational decisions, non-emergency healthcare, religious upbringing, and extracurricular activities were to be joint decisions between the parents. Uncovered reasonable and necessary medical expenses were to be shared between the parents on a pro rata basis. Further, the parenting plan provided: "As additional child support, Father shall pay fifty percent (50%) of the extracurricular activity expenses incurred for the children's benefit."

In January 2015, Mother filed a petition for modification of the permanent parenting plan, alleging a material change of circumstances arising from Father's notice of intent to relocate to Oregon. In March 2015, Father filed his answer and counterclaim, challenging his alimony obligation under the MDA in light of Mother's increased earning ability since the divorce. Father also requested that the younger child be allowed to move with him to Oregon, with the older child to remain in Chattanooga. In July 2015, Mother requested leave to amend her petition for modification to assert several claims of contempt against Father. The Trial Court granted the motion to amend. This case was tried in April 2016.

Mother testified. Mother, a social worker, received her master's degree in 2012. Mother testified that Father failed to pay her one half of $4,013.99 she had incurred for the children's extracurricular activities. Mother testified that she also had incurred $4,641.51 in medical expenses, and that Father owed her half of that, as well. When asked if she knew why Father was not paying her, Mother stated: "He told me that he didn't feel like he needed to pay that."

On cross-examination, Mother testified regarding extracurricular activities as follows:

Q. In fact, if you look at the parenting plan on page -- I think it's page -- on Page Four, any decisions regarding extracurricular activities had to be a joint decision. Is that correct?
A. Yes.
Q. And then if there was a joint decision on it, then paragraph one under child support said that he would pay 50 percent?
A. Yes.
Q. So you had no problem with that for awhile?
A. Yes.
Q. And I believe you told me that these additional extracurricular activity fees that you're now seeking to recover, that he only quit paying those when he said he was not agreeing on extracurricular activities anymore. Is that correct?
A. Yeah. He sent me an email, I believe, that said he wasn't paying any more of the extracurriculars.
Q. He wasn't agreeing to those extracurricular activities?
A. He said he wasn't paying. That's all. I mean, these are activities they've always done, so I don't know -- he didn't say that specifically like that.
Q. Well, didn't you tell me that your list of extracurricular activity charges was only after he said he was not agreeing anymore to extracurricular activities?
A. When he said he wouldn't pay anymore?
Q. Well, maybe we're quibbling over words.
A. Okay.
Q. Let's look at Page 32 and see -- make sure that I'm not remembering it incorrectly. On Page 32, my question was on Line Four: But he was definitely telling you I'm not agreeing to it anymore. And you said yeah, right. So everything you've listed on here is what you've paid since he said I'm not agreeing anymore. And your answer was what, on Line Nine? What was your answer on Line Nine?
A. Yes.

Mother testified further regarding flooding problems at her home:

Q. Isn't it true, Mrs. Wagoner-Angelin, that the only thing you discussed with him at the time he signed this agreement was that he would build this diversion mound on the driveway? He had already started that, in fact, had he not?

-4-

A. No to the first part of your question, yes to the second part. The reason that it ended up in the divorce decree, this has been a big issue for me because for years I would tell him to deal with it and he never did. That's why it was specifically in there. As a matter of fact, I told him that because this has been such a problem for us for years that we needed it in the divorce decree. But his idea he told me was we need a bigger bump. That's the answer. But what his -- what had previously been done is he made a mound in the back yard and then the grates like they were without any consulting of anybody to be able to address the issue. So that is why it has been in the divorce decree, because it's been a problem, ongoing problem, for years. It didn't just start. We do not live in a flood plain or anything like that.

Q. Well, what I'm asking you is, he had already done some work before. You said he had installed pipes before.

A. And the mound.

Q. He had already installed pipes before he started building the mound, correct?

A. Oh, the pipes were built years ago.

Q. Yeah, earlier.

A. Right.

Q. He had done that?

A. Yes.

Q. Okay. And then the only thing you discussed with him at the time he signed this agreement to, quote, "resolve the flooding problem" was to build this mound. Is that correct?

A. No. That was his idea to fix it.

Q. Well --

A. Mine was I wanted the flooding problem totally fixed, but it wasn't just going to be a mound. And he and I argued about that because he felt making the wall bigger would help.

Regarding medical decisions, Mother stated:

Q. Let me show you -- I guess it's Exhibit Five, is your list of bills. I'll show you Exhibit Four, too. I'll ask you questions about that. Were the only two bills listed on there that you discussed with him the McCamish and the Susong bills?

A. He was aware when there were -- for the most part, he was aware when they went to the different appointments. But then when he stopped paying, I would send him emails telling him about them, you know, which was -- which was due or what was being paid.

-5-

Q. Well, remember, I asked you in your deposition on Page 29 if you had -- if you had discussed certain bills with him, such as Covenant Allergy & Asthma, and you said no. And then I asked you on Line 23, on Page 29, but he did discuss Susong and did discuss McCamish with you. And you said yes. Is that correct?

A. Yes, because this was -- this was after – I believe, if I remember right, this was after the point when we weren't communicating.

Father, age 46, testified. Father stated that he moved to Oregon in 2015 but returned that year. Father had remarried since the divorce. Father, a systems analyst who worked with computers, testified that he earns $5,800 per month. Father testified that he did not retain an attorney to review the MDA with him. Father asked the Court to make the alimony modifiable, notwithstanding the terms of the MDA. Father testified regarding his finances:

Q. Slightly less than $70,000?
A. Yes.
Q. And you're paying her 30?
A. Yes.
Q. And does that leave you 40 before tax?
A. Yes.
Q. And if she's making 50 and you're giving her 30, she's living on 80,000. Is that correct?
A. Yes.
Q. Are you able to continue to afford to live on $40,000 a year --
A. No.
Q. -- with your expenses?
A. No.

Regarding extracurricular activities, Father testified:

Q. And then I want to ask you what this document is, sir.
A. These are extracurricular activities that I paid for out of the savings that I had.
Q. And how much did you pay during the – what's the time period that we're taking about? What's the earliest date and the latest date on this list?
A. September of 2012 through October of 2014.
Q. And what's the total of extracurricular activities you paid during that period?
A. $4,062.60.
Q. Did she ever reimburse you for one half of these?

A. No.

Q. Did you ever ask her for it?

A. Well, we -- we discussed it. I in fact, she had asked me to give her a list of what I had paid.

Q. And did she start sending you expenses after October of 2014?

A. Yes.

Q. Did you pay any of those?

A. No.

Q. Why did you not pay any of those?

A. I didn't have any money. I was broke. My savings had ran out and I was broke. I was living off of only what I made month to month.

Q. Did she incur expenses with the children that you never agreed to?

A. Yes.

Q. Did she do it unilaterally?

A. Yes.

Q. Did you still pay it?

A. No.

Q. After October of 2014, did you pay anything that she did without your consent --

A. No.

Q. -- or agreement?

A. No.

Josh Riley ("Riley"), a handyman who inspected Mother's home, testified. Riley had worked on flooding prevention and remediation for seven years. Riley testified that resolving the flooding issues at Mother's home would cost $12,710. This sum included the cost of re-grading, gravel, and installing drains. Riley acknowledged he was not a licensed engineer, nor had he a contractor's license.

In May 2016, the Trial Court entered an order stating:

This cause is before the Court on the Petition for Modification of the Permanent Parenting Plan filed January 14, 2015, the Answer and Counterclaim of the defendant, and the Amended Complaint and Petition for Modification. The Petitions for Modification are grounded in large part on the defendant's intent to relocate to Oregon. At the time of trial, the Father had relocated to Oregon and returned to Chattanooga and the older of the two children had "aged out." Those occurrences left for resolution by trial:

--The counter-petitioner's request to modify the child support due to changes in the income of the parties;

--Whether there should be an upward deviation in the child support;
--Modification of the child support because of there now being only one child who is a minor;
--The petitioner's contention the residential schedule adopted by entry of the October 30, 2012 Final Decree should be modified because of failure of Father to exercise his residential time; and
--Allegations of contempt based on the Marital Dissolution Agreement and respondent's alleged violation thereof.

Respondent also moves under Rule 60.02(4) of the *Tennessee Rules of Civil Procedure* to be relieved from the alimony obligation of the Final Judgment.

The Court heard the testimony of the parties and the testimony of Josh Riley who testified concerning the cost of making repairs to the driveway. Based upon the file as a whole, the evidence before the Court, and the Court's assessment of credibility, the Court finds as follows:

The Court first will address the Motion for Relief from Judgment. Mr. Angelin seeks to modify paragraph 2.1 of the Marital Dissolution Agreement which provides in pertinent part:

> Husband shall pay to Wife the sum of One Thousand Five Hundred Dollars ($1,500.00) per month beginning the first day of the month following the entry of the Final Decree of Divorce in this matter, as non-modifiable alimony for a period of ten (10) years. . . . All unpaid alimony payments for the period stated in and pursuant to this paragraph shall terminate upon Wife's death but not upon Husband's death or the remarriage of Wife. . . .

The evidence establishes Mrs. Wagoner-Angelin was represented by counsel and Mr. Angelin was not represented at the time of the negotiation of the settlement. However, there is no evidence of fraud or any other basis for setting aside this portion of the Final Decree. While the Husband contends the judgment no longer is equitable, it is clear he simply is rethinking his position. The language of the Marital Dissolution Agreement is clear and unequivocal and is not couched in any legalese which would be difficult for him to understand. Mr. Angelin concedes he never met or negotiated with Attorney Lawrence but came in and signed the papers. He is well educated. It is his contention that the agreement simply is not fair and he did not understand the alimony did not terminate except at the end of ten years. Mrs. Wagoner-Angelin testified Mr. Angelin read the

-8-

agreement and had ample opportunity to read and question the agreement. The Court does not find a basis to set aside the agreement. While the Husband and Wife did not discuss the issues together, there is evidence they did read it together out loud. The Court does not find that there is a reason justifying relief from the operation of the judgment.

The Petition for Contempt is based on the contention of plaintiff Wagoner-Angelin that Mr. Angelin is in contempt of court for violating paragraph 4.2 of the Marital Dissolution Agreement which provides:

> Husband shall be responsible for resolving the flooding issues of the Marital Residence and will ensure that a termite inspection and treatment for termites in the Marital Residence is completed within six (6) months of the filing of the Final Decree of Divorce in this matter. Husband shall also be responsible for the repair and stain of the deck and porch at the Marital Residence as well as the repair and stain of their children's wooden jungle gym within one (1) year of the entry of the Final Decree of Divorce in this matter.

The flooding issue is an issue which has been a problem at the marital residence for many years. The Wife testified the flooding problem was known from the beginning and they talked about it before the agreement was signed. The Husband's resolution was to put a big bump in the driveway to divert the water. That attempted repair was completely ineffective. Exhibit 1 demonstrates the flow of the water through the yard and the current condition of the driveway. The defendant built the hump in the driveway but never finished it because no one could drive over it. The hump was his proposed resolution. After he worked on the hump she told him not to touch it again. He testified she hired someone to fix it and paid that person $1,213.00 which he reimbursed. The testimony of Josh Riley now establishes that the flooding repair attempt was very ineffective and that the repair was done inappropriately. There should have been larger french drains or pipes installed and the alleged repair simply cannot support the situation.

The Court finds that no matter how long the condition has been there, the Marital Dissolution Agreement is clear and unambiguous in its requirement of the Husband to resolve "the flooding issues of the Marital Residence." Both parties articulate the flooding issue at the residence in the same way describing the water problems in the back yard. The Court finds resolution of that problem is the responsibility of Mr. Angelin under

the Marital Dissolution Agreement and that the petitioner has established damages in the amount of $12,710.00 which is the cost of repair.

The Marital Dissolution Agreement also requires the Husband to "ensure that a termite inspection and treatment for termites in the Marital Residence is completed within six (6) months of the filing of the Final Decree of Divorce in this matter." The Husband has undertaken an inspection himself and there has been no treatment. He has no expertise or training in the detection or eradication of termites. He says he can look at wood and tell if termites are present. The Court finds he has failed to meet his obligations under the Marital Dissolution Agreement on this issue and is required to pay for an inspection of the residence and any required treatment within 45 days of entry of this Order.

Last of the Marital Dissolution Agreement issues is the obligation of the Husband to repair and stain the deck and porch on the marital residence and the children's wooden jungle within one year of entry of the Final Decree. Again, he has failed to meet his obligations. Some of the deck has been stained by the Wife at a cost to her of $171.23. That job has not been completed and the children's jungle gym has not been repaired and stained. Despite the fact that the children no longer use it, he assumed that obligation under the Marital Dissolution Agreement and shall complete this obligation and the deck staining and repair within 45 days of entry of the Final Decree. In the event defendant fails to complete his obligations within the time set in this Order, plaintiff shall complete them and defendant shall reimburse her immediately for the cost upon presentation of proof of the expenses. Judgment is entered for the $171.23 petitioner already has spent trying to meet respondent's obligation.

The Court now will turn to the prayer for modification of the Permanent Parenting Plan. T.C.A. 36-6-101(a)(2)(C) sets out the standard for modification of the Court's prior decree pertaining to a residential parenting schedule. The petitioner is required to prove by a preponderance of the evidence a material change of circumstances affecting the child's best interest. Relevant to this case, such a material change of circumstances may be alleged to be the failure to adhere to the Parenting Plan or other circumstances making a change in the residential parenting time in the best interest of the child.

The original Permanent Parenting Plan provided for the Father to have parenting time with the children from Saturday at 12:00 p.m. until Monday at 9:00 p.m. every week. The Mother's proposed plan which is Exhibit 3 proposes the Father have one weekend per month from Saturday at an unspecified time until Sunday at 6:00 p.m. and every Sunday from 9:00 a.m. to 8:00 p.m. The Father proposes he have both children as agreed

-10-

upon by the children and the Father but not less than four days every two weeks for Rachel. He proposes all other times be flexible.

First, the Court notes only Rachel remains a minor within the jurisdiction of this Court for Parenting Plan purposes. Further, it is stipulated that there is only a child support obligation left for Rachel. The Court does not find a flexible agreement such as proposed by Father in the best interest of the child. The Mother feels more specificity is necessary and this Court agrees. The Father has not seen the children on the residential schedule previously established but testifies that he has seen the children every other week or so and in the last year they have spent the night with him two times because of difficulty in his finding housing.

The Court finds neither proposed Parenting Plan in the best interest of the children and does not find it in the best interest of Rachel to modify the current residential schedule. It provides the specificity sought by Mother and gives Father time with Rachel he can exercise as his living situation stabilizes.

The Court does find child support must be recalculated because of Barbara having reached the age of majority. The Court finds the parties originally agreed to an upward deviation in child support because of the Father's agreement to be responsible for a portion of the children's private school tuition. He also was responsible for 50 percent of the extracurricular activity expenses. The Court finds it has been the practice in this family for the children to receive a private school education. Both parents instituted and abided by this practice. At the time of the entry of the Final Decree of Divorce, Mr. Angelin was earning substantially more than Mrs. Wagoner-Angelin and he found an equal division of tuition and extracurricular activities expenses fair at that point. The Court finds that division still to be fair and ORDERS him to pay one-half of the tuition utilizing school expenses as an upward deviation.

The Court further finds Father is in contempt for failure to pay medical and extracurricular activity expenses as agreed to in the original Permanent Parenting Plan. He has the ability to make these payments for which he is obligated. The Court finds Mr. Angelin has failed to pay for one-half of the uncovered medical expenses and judgment is entered against him in the amount of $2,320.75 for his one-half of that obligation. Further, he owes one-half of the extracurricular activity expenses, which expenses total $4,013.99 as reflected on Exhibit 5. Accordingly, he owes one-half of that amount or $2,007.00 for which judgment is entered.

Counsel are ORDERED to calculate the child support within the dictates of this Memorandum Opinion, to submit a Child Support Worksheet and a Final Decree consistent with this Memorandum Opinion.

The costs of this cause are taxed against defendant Angelin for which execution may issue if necessary. The Court finds attorney's fees for collection of the extracurricular activities and medical expenses should be taxed to the Father as they are in the nature of child support. Attorney Lawrence is ORDERED to submit an attorney's fee affidavit for expenses related to these two issues.

The Court finds both parties to be credible. Mr. Angelin was fairly frank in his testimony. It is clear that he simply signed an agreement he now wishes to back out of and there is no relief available to him under the facts of this case when the applicable law is addressed.

In July 2016, the Trial Court entered an additional order, this time stating:

This cause came to be heard before the Honorable L. Marie Williams, Circuit Court Judge for the Eleventh Judicial District of Hamilton County, Tennessee, Division III, upon the Petition for Modification of the Permanent Parenting Plan filed on January 14, 2015 by Mary Wagoner-Angelin ("Petitioner"), the Answer and Counterclaim filed by Randall Jon Angelin ("Respondent"), and the Petitioner's Amended Complaint and Petition for Modification. Based upon the Court's findings and its ruling in this cause as set forth in the Memorandum Opinion entered on the 19th day of May, 2016, it is ORDERED, ADJUDGED, and DECREED that:

1. Randall Jon Angelin's Motion for Relief from Judgment is denied and for the reasons stated in the Memorandum Opinion the Court declines to modify paragraph 2.1 of the Marital Dissolution Agreement regarding the non-modifiable alimony.

2. Randall Jon Angelin is in contempt for his failure to resolve the flooding issues of the Marital Residence, the cost of which is established as being Twelve Thousand Seven Hundred and Ten Dollars ($12,710.00), and therefore a judgment is entered against Randall Jon Angelin in the amount of Twelve Thousand Seven Hundred and Ten Dollars ($12,710.00) for which execution may issue if necessary.

3. Randall Jon Angelin is in contempt for his failure to ensure that a termite inspection and treatment for termites in the Marital Residence was completed within six (6) months of the filing of the Final Decree of Divorce in this matter. Therefore, Randall Jon Angelin is required to pay for an inspection of the Marital Residence and any required treatment within 45 days of entry of the entry of this Final Decree.

4. Randall Jon Angelin is in contempt for his failure to repair and stain the deck and porch on the Marital Residence and the children's

-12-

wooden jungle gym within one year of entry of the Final Decree of Divorce. For funds already expended by May Wagoner-Angelin in her attempt to repair and stain the deck, a judgment is entered against Randall Jon Angelin in the amount of One Hundred and Seventy-One Dollars and Twenty-Three Cents ($171.23). Further, Randall Jon Angelin is ordered to complete the repair and staining of the deck and porch on the Marital Residence and the children's wooden jungle gym within 45 days of entry of this Final Decree. In the event that Randall Jon Angelin fails to complete his obligations within the time set in this Order, Mary Wagoner-Angelin may complete the obligations and Randall Jon Angelin shall reimburse Mary Wagoner-Angelin immediately for the cost upon presentation of proof of the expenses.

5. The parties' youngest child, Rachel, is the only minor child of the parties for which Randal Jon Angelin continues to have a child support obligation. As an upward deviation from his basic child support obligation, Randall Jon Angelin shall continue to pay one-half of the private school tuition for the parties' minor child, Rachel. The Child Support Worksheet attached hereto as Exhibit "A" is approved and adopted by this Court and incorporated herein by reference as stating the Court's Child Support Order, with each provision thereof becoming an Order of this Court, and jurisdiction is retained in this Court for enforcement of this Order and issuance of such further Orders as may be necessary;

7. Randall Jon Angelin is in contempt for his failure to pay medical and extracurricular activity expenses as agreed to in the original Permanent Parenting Plan, and for his failure to pay for one-half of the uncovered medical expenses, a judgment is entered against Randall Jon Angelin in the amount of Two Thousand, Three Hundred and Twenty Dollars ($2,320.75), and for his failure to pay one-half of the extracurricular activity expenses, a judgment is entered against Randall Jon Angelin in the amount of Two Thousand and Seven Dollars ($2,007.00);

8. The Court finds attorney's fees for collection of the extracurricular activities and medical expenses should be taxed to Randall Jon Angelin as they are in the nature of child support and Mary Wagoner-Angelin's attorney shall submit an attorney's fee affidavit for expenses related to these two issues.

9. The costs of this cause are taxed against the Defendant, Randall Jon Angelin, for which execution may issue if necessary.

In August 2016, the Trial Court entered an order denying Father's motion to alter or amend judgment. In February 2017, the Trial Court entered its final order in this matter, granting an award of attorney's fees to Mother in the amount of $2,956.54 related

to collecting extracurricular and medical expenses from Father. Father appeals to this Court.

## **Discussion**

Although not stated exactly as such, Father raises the following five issues on appeal: 1) whether the Trial Court erred in failing to modify Father's alimony obligation; 2) whether the Trial Court erred in modifying the parenting plan to require Father to pay educational expenses; 3) whether the Trial Court erred in finding Father in contempt for failure to adhere to the MDA; 4) whether the Trial Court erred in finding violations of the parenting plan by Father; and, 5) whether the Trial Court erred in awarding attorney's fees to Mother related to collection of extracurricular and medical expenses. Mother raises her own issue of whether the Trial Court erred in declining to find Father in contempt for not paying one-half of her attorney's fees in the underlying divorce action as provided in the MDA.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first address whether the Trial Court erred in failing to modify Father's alimony obligation. Father seeks relief pursuant to Tenn. R. Civ. P. 60.02. According to Father, the fact that he is to pay $1,500 per month to Mother as non-modifiable alimony is harshly inequitable. Father adds that he was unrepresented when the MDA was signed, and he did not understand the agreement fully. Our Supreme Court has discussed relief from judgment under Rule 60.02, as relevant:

> [W]e have characterized relief under Rule 60.02 as an "exceptional remedy," *Nails v. Aetna Ins. Co.*, 834 S.W.2d 289, 294 (Tenn. 1992), "designed to strike a proper balance between the competing principles of finality and justice," *Jerkins v. McKinney*, 533 S.W.2d 275, 280 (Tenn. 1976). Rule 60.02 provides an "escape valve," *Thompson v. Firemen's Fund Ins. Co.*, 798 S.W.2d 235, 238 (Tenn. 1990), that "should not be easily opened." *Toney v. Mueller Co.*, 810 S.W.2d 145, 146 (Tenn. 1991). We have reversed relief granted under Rule 60.02 where the judgment was "not oppressive or onerous." *Killion v. Tenn. Dep't of Human Servs.*, 845 S.W.2d 212, 214 (Tenn. 1992). "[R]elief under Rule 60.02 is not meant to be used in every case in which the circumstances of a party change after the

-14-

entry of a judgment or order, nor by a party who is merely dissatisfied with a particular outcome." *Henderson*, 318 S.W.3d at 336.

*** 

> Although motions based on Rule 60.02(5) are subject only to the "reasonable time" limitation, Tenn. R. Civ. P. 60.02; *see also Rogers*, 50 S.W.3d at 446, Rule 60.02(5) has been construed narrowly by Tennessee's courts. *See Holiday v. Shoney's South, Inc.*, 42 S.W.3d 90, 94 (Tenn. Ct. App. 2000) (citing *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993)). Rule 60.02(5) does not "relieve a party from his or her free, calculated, and deliberate choices." *Id*. Instead, the rule "affords relief in the most extreme, unique, exceptional, or extraordinary cases and generally applies only to circumstances other than those contemplated in sections (1) through (4) of Rule 60.02." *Holiday*, 42 S.W.3d at 94. An untimely request under Rule 60.02(1) or (2) may not be asserted under Rule 60.02(5). *Wallace v. Aetna Life & Cas. Co.*, 666 S.W.2d 66, 67 (Tenn.1984); *Holiday*, 42 S.W.3d at 94; *Henderson v. Kirby*, 944 S.W.2d 602, 605 (Tenn. Ct. App. 1996). Relief under Rule 60.02(5) is not proper "simply because relief under other provisions is time barred." *Wallace*, 666 S.W.2d at 67.

*Furlough v. Spherion Atlantic Workforce, LLC*, 397 S.W.3d 114, 127-28 (Tenn. 2013).

The Trial Court found that "[i]t is clear that [Father] simply signed an agreement he now wishes to back out of and there is no relief available to him under the facts of this case when the applicable law is addressed." We agree. As stated in the authority quoted above, mere dissatisfaction is not a ground for the kind of extraordinary relief permitted under Rule 60.02. We affirm the Trial Court in its determination that Father is bound by the terms of the MDA, including his alimony obligation.

We next address whether the Trial Court erred in modifying the parenting plan to require Father to pay educational expenses. Father argues that this decision by the Trial Court ignored Mother's increased earnings since the divorce, as well as the fact that one child had aged out of child support altogether. In response, Mother argues that the parties consistently had sent their children to private school, and that the upward deviation appropriately facilitated this practice for the remaining minor child. With respect to upward deviations in child support for educational expenses, this Court has stated:

> Decisions regarding extraordinary expenses and private school tuition are very fact specific. *Carlson v. Carlson*, No. E2007-01276-COA-R3-CV,

2008 WL 4735307, at *6 (Tenn. Ct. App. Oct. 27, 2008). "These expenses may be, but are not required to be, divided between the parents according to each parent's [percentage of income]." Tenn. Comp. R. & Regs. 1240-02-04-.07(2)(d). The use of the term " 'may' grants the trial court discretion in determining payment of private school tuition." *Martin v. Martin*, No. W2014-01007-COA-R3-CV, 2015 WL 2400583, at *6 (Tenn. Ct. App. May 20, 2015) (*no perm. app. filed* ) (citing *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *10 (Tenn. Ct. App. Apr. 2, 2009)); *see also Massey v. Casals*, 315 S.W.3d 788, 797 (Tenn. Ct. App. 2009) ("The award of such deviation is within the discretion of the tribunal.") "Trial courts have discretion in deciding whether to impose the extraordinary expense of private school tuition on a party." *Johnson*, 2009 WL 890893, at *11. A trial court can order payment of less than the full amount of a child's extraordinary educational expenses depending on the proof in a particular case. *Martin*, 2015 WL 2400583, at *7. The trial court is required to calculate the extraordinary educational expenses separately and to add them to the base child support award. *In re Andrea A.R.*, No. M2011-00574-COA-R3-JV, 2012 WL 397475 at *7 (Tenn. Ct. App. Feb. 7, 2012).

*Henegar v. Henegar*, No. M2015-01780-COA-R3-CV, 2016 WL 3675145, at *15 (June 29, 2016), *no appl. perm. appeal filed*.

The Trial Court found relative to this issue as follows:

The Court does find child support must be recalculated because of Barbara having reached the age of majority. The Court finds the parties originally agreed to an upward deviation in child support because of the Father's agreement to be responsible for a portion of the children's private school tuition. He also was responsible for 50 percent of the extracurricular activity expenses. The Court finds it has been the practice in this family for the children to receive a private school education. Both parents instituted and abided by this practice. At the time of the entry of the Final Decree of Divorce, Mr. Angelin was earning substantially more than Mrs. Wagoner-Angelin and he found an equal division of tuition and extracurricular activities expenses fair at that point. The Court finds that division still to be fair and ORDERS him to pay one-half of the tuition utilizing school expenses as an upward deviation.

Father argues on appeal that the Trial Court lacked sufficient justification for the increased award to Mother for educational expenses. The evidence preponderates in

-16-

favor of a finding that such an upward deviation is appropriate. As found by the Trial Court, the $1,000 in child support originally agreed to by the parties included an upward deviation because of Father's agreement to be responsible for a portion of the children's private school tuition. The Trial Court's decision to recalculate the child support because only one child is now below the age of majority and ordering Father to pay one-half of the one child's tuition as an upward deviation is both consistent with the original agreement of the parties and the evidence presented in this case. As noted by the Trial Court, Father found an equal division of tuition and extracurricular activities to be fair at the entry of the divorce even though Father was making substantially more than Mother. We find no error by the Trial Court in finding this still to be fair even though Mother's financial situation has considerably improved. We, therefore, affirm the Trial Court in its finding an upward deviation for educational expenses to be appropriate as the evidence preponderates in favor of such a finding.

We next address whether the Trial Court erred in finding Father in contempt for failure to adhere to the MDA. Father argues that the MDA provision requiring that he resolve the flooding issues at the marital residence is ambiguous, and that he should not be required to pay the $12,710 handyman Riley testified it would cost to correct the flooding problem. Father argues also that Riley lacks suitable credentials and his testimony should not even have been admitted.

Initially, with respect to the money awarded to Mother on this issue, we recognize that it was granted in the context of a finding of civil contempt. However, we regard the award as aimed toward ensuring Father's compliance with the MDA as ordered by the court. We addressed a similar scenario in another case, to wit: "The $50,000 judgment did not constitute an award of damages but, rather, was designed to secure Husband's compliance with the final decree; as such, it was a reasonable exercise of the court's contempt power." *Dukes v. Dukes*, No. M2014-00847-COA-R3-CV, 2015 WL 9946275, at *6 (Tenn. Ct. App. Aug. 13, 2015), *no appl. perm. appeal filed.* We find Father's argument that the MDA language is ambiguous to be without merit. On the contrary, the MDA is quite clear. Father's homemade remedies did not fix the problem. The Trial Court did not err in ordering Father to comply with his obligation under the MDA to properly resolve the flooding problem at the marital residence by paying Mother the $12,710 the evidence at trial reflected it would cost to accomplish this.

With regard to Riley's credentials and testimony, we note the broad discretion courts have in admitting evidence. "In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997). We note further that Father did not object to Riley's testimony at trial. We affirm the Trial Court on this issue.

-17-

We next address whether the Trial Court erred in finding other violations of the parenting plan by Father. The Trial Court ordered Father to pay $2,007 for half of the $4,013.99 of extracurricular activities incurred by Mother, as well as $2,320.75, one half of the $4,641.51 Mother incurred in medical expenses. However, Father argues he agreed only to $1,549 of the medical expenses. Father argues also that he agreed only to $1,078 worth of the extracurricular activities. Indeed, Father asserted below and now on appeal that, after the divorce, he spent $4,062.60 on extracurricular expenses for which Mother never repaid him, and that therefore no judgment on extracurricular expenses should have been entered by the Trial Court at all.

Both non-emergency healthcare and extracurricular activities were to be joint decisions by the parents under the terms of the permanent parenting plan. As we interpret the permanent parenting plan then in effect, a party may not recover expenses for what are supposed to be joint decisions that instead are taken unilaterally. The Trial Court, in entering awards for Mother, does not appear to have considered whether both parents agreed to what were supposed to have been joint decisions. As the Trial Court also explicitly found both parties credible, we do not know what to make of the parties' competing characterizations of their communications on joint decisions. We, therefore, vacate the awards granted to Mother regarding violations of the permanent parenting plan as to extracurricular or medical expenses, and remand for the Trial Court to determine whether either parent owes the other any unpaid extracurricular or medical expenses. On remand, the Trial Court is to consider and make specific determinations as to whether both parents agreed to the extracurricular or non-emergency healthcare decisions at issue, or, whether one parent proposed the idea and the other parent simply failed to exercise his or her right not to agree. A parent's failure neither to agree nor not to agree shall be treated as agreement.

The final issue of Father's we address is whether the Trial Court erred in awarding attorney's fees to Mother for collection of unpaid extracurricular and medical expenses. In light of our resolution of the previous issue regarding violations of the permanent parenting plan as to extracurricular and medical expenses, we vacate the Trial Court's award of attorney's fees to Mother for enforcement of the permanent parenting plan. Whether attorney's fees, and, in what amount, may be ordered on remand, necessarily will hinge upon the Trial Court's fresh determination of which parent owes what as to extracurricular or medical expenses.

We next address Mother's issue of whether the Trial Court erred in declining to find Father in contempt for not paying one-half of her attorney's fees in the underlying divorce action as provided in the MDA. Father argues that Mother already was compensated for her attorney's fees through the division of the marital estate. The Trial

Court did not make explicit findings regarding this issue. Therefore, on remand, the Trial Court is to set forth findings of fact and conclusions of law as to the issue of whether Father is in contempt for not paying a portion of Mother's attorney's fees in connection with the MDA and final decree of divorce.

To summarize, we affirm the Trial Court (1) in its determination that Father is bound by the terms of the MDA, including the alimony provision; (2) the Trial Court in its imposing an upward deviation for educational expenses from Father's basic child support; and, (3) that Father was in contempt for failure to adhere to the MDA by his failure to effect the required housework—most notably failing to resolve the flooding problem, for which the Trial Court's order for Father to pay $12,710 to fix the problem is affirmed. We vacate and remand on the issues of extracurricular and medical expenses, as well as attorney's fees related to those issues, pending a fresh determination by the Trial Court concerning compensation only for any unpaid extracurricular or medical expenses agreed upon by the parties after being given a genuine opportunity to agree or disagree. Finally, the Trial Court is to make findings of fact and conclusions of law as to whether Father is in contempt for not paying one-half of Mother's attorney's fees as provided for in the MDA.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and vacated, in part, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and for collection of the costs below. The costs on appeal are assessed one-half equally between the Appellant, Randall Jon Angelin, and his surety, if any, and the Appellee, Mary Wagoner-Angelin.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-19-